UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | |
|---|---|
| RONALD R. SMITH, JR. ) | |
| ) | |
| Petitioner, ) | |
| ) | |
| v. ) | No. 4:09 CV 1227 HEA/DDN |
| ) | |
| DON ROPER, ) | |
| ) | |
| Respondent. ) | |

**ORDER AND RECOMMENDATION OF**
**UNITED STATES MAGISTRATE JUDGE**

This action is before the court upon the petition of Missouri state prisoner Ronald R. Smith, Jr. for a writ of habeas corpus pursuant to 28 U.S.C. § 2254. (Docs. 1, 16.) Petitioner has also moved for appointment of counsel (Docs. 33, 38), for an evidentiary hearing (Doc. 34), to substitute a party (Doc. 35), for contempt (Doc. 36), and for leave to amend his petition (Doc. 37). The action was referred to the undersigned United States Magistrate Judge for review and a recommended disposition pursuant to 28 U.S.C. § 636(b). For the reasons set forth below, the undersigned recommends that the petition for a writ of habeas corpus be denied.

**I. BACKGROUND**

On February 26, 1999, a jury in the Circuit Court of Dent County, Missouri found petitioner Ronald R. Smith, Jr. guilty of second-degree murder. (Doc. 11, Ex. D at 1169-70.) This decision followed petitioner's previous first-degree murder conviction arising from the same underlying incidents, which the Missouri Court of Appeals reversed and remanded. State v. Smith, 934 S.W.2d 324 (Mo. Ct. App. 1996) (reversing due to instructional error). On March 19, 1999, the trial court sentenced petitioner to a term of life imprisonment to run concurrently with his sentences of life imprisonment and 20 years imprisonment from a related action. (Doc. 11, Ex. D at 1203.) The Missouri Court of Appeals affirmed the judgment on January 5, 2001. (Doc. 11, Ex. E at 1-2.)

On June 1, 2001, petitioner filed a motion for post-conviction relief under Missouri Supreme Court Rule 29.15. (Doc. 11, Ex. H at 1.) After a hearing on October 5, 2007, the circuit court denied petitioner's motion on December 10, 2007. (Id. at 4-5.) Petitioner appealed the denial of his motion, and the Missouri Court of Appeals affirmed on January 6, 2009. (Doc. 11, Ex. K.)

In its supplemental opinion denying petitioner's direct appeal from his conviction, the Missouri Court of Appeals described the facts which supported the jury's verdict thus:

> On the afternoon of November 9, 1991 [petitioner], Donny Henson, John Smith, and Terry Henson met at Donny's house in Arnold, Missouri, where Donny, Terry, and John all lived. [Petitioner], Donny, John, and Terry are all related by either blood or marriage: Donny Henson is Terry Henson's father and John Smith's brother-in-law; and John Smith is [petitioner]'s uncle. Donny's daughter, Shelly, had taken Donny's car to Lake [Wappapello] without his permission, and Donny wanted to retrieve it. [Petitioner] agreed they could drive his car to Lake [Wappapello] to look for Donny's car, so Donny and Terry grabbed their guns, and the four left for Lake [Wappapello].
>
> At Donny's sister's house in Lake [Wappapello], Donny and his sister talked briefly, and then Donny took a rifle from the house and loaded it into [petitioner]'s car. From there, the group then drove to a pool hall in Puxico, Missouri, where [petitioner] and Terry got into a fight with Shelly's boyfriend, Alvin Hobbs. They then drove to a bar in Poplar Bluff, where John and Terry played pool and Donny and [petitioner] argued. [Petitioner] allegedly spoke of kicking in a door and shooting a place up, to which Donny responded with words to the effect of "you ain't got the heart to kill nobody." A gun was passed back and forth between the two, which apparently ended up in [] [petitioner]'s possession.
>
> After leaving the pool hall, the group then drove back to Lake [Wappapello], and parked their car a half block from Bill Sadler and Mary Sadler's residence. The group believed that Mary's son, Rodney Norman, lived with the Sadlers. Rodney Norman knew both Terry Henson and Donny Henson. According to the testimony presented at trial, Donny had previously shot Rodney Norman and killed Rodney's friend Terry Brant in a September 25, 1988 altercation at Asher Creek, Missouri. Rodney later testified against Donny at Donny's trial for the murder of Terry Brant, for which Donny was acquitted, and was scheduled to testify against Donny at his trial for first degree assault in November, 1991.
>
> [Petitioner] and Donny pulled on brown jersey gloves and walked to the Sadlers' front porch, and then proceeded to kick in the front door of the house. After awaking to "hollering and screaming," Bill Sadler walked down the hallway, and saw

his wife, Mary, and two men inside the Sadlers' house, near their front door. One of the men was holding Mary's arm, and the other stood in front of her. Bill could not make out their faces, but said that the man holding Mary was approximately 5'10" tall and weighed 160-170 pounds, and the other man was approximately 5'6" tall. Bill heard voices from the porch and saw a third man through a window, who was approximately 5'6" to 5'8" tall. One of the voices from the porch yelled, "kill them, kill them all" and the men inside the house turned and saw Bill. The shorter man shot him. Bill dragged himself back to his bedroom, and closed and barricaded the door with a chest of drawers. He heard six to eight shots fired in the living room, after which the men began to shoot and kick at the bedroom door. Bill threw himself out the bedroom window. As he crawled around the house, two or three more shots were fired.

    After the second round of shots, Terry Henson and John Smith went into the Sadlers' house and discovered that Donny had been shot. [Petitioner] stood over Donny's body and proclaimed, "the fucking snitch is dead," allegedly referring to the fact that Donny, a "confidential informant" for the Missouri State Highway Patrol, had "snitched" on [petitioner]'s father, Ronald "Smokey" Smith, Sr. [Petitioner] and John had Terry retrieve the car, and loaded the weapons and Donny's body into the trunk.

    After they drove off, Bill dragged himself back into the house, where he discovered Mary's body, and called 911. Later that evening, [petitioner], John[,] and Terry threw the guns off a bridge and then dumped Donny's body into a creek. The next day, a deputy for the Jefferson County Sheriff's Department located Donny's body. Two days later, after [petitioner], John, and Terry had made statements to the police, divers from the Missouri State Water Patrol recovered the weapons from Lake [Wappapello].

    A forensic pathologist determined that Mary died of a single gunshot wound to the chest, and noted that the pattern abrasions on her face indicated she had been struck across the face by someone wearing a jersey glove. A criminalist supervisor for the Missouri State Highway Patrol Crime Laboratory Division determined that the shot casings recovered from the scene of the crime and the bullets from the victims' bodies matched the guns found in the lake.

(Doc. 11, Ex. E at 4-7.)

## II. PETITIONER'S GROUNDS FOR HABEAS RELIEF

Petitioner claims four grounds for relief in his original and amended habeas petitions:

(1) Appellate counsel rendered ineffective assistance in failing to raise on appeal the trial court's denial of his motion to dismiss based on a violation of his right to a speedy trial.

(2) Trial counsel was ineffective in failing to call Nancy McKerrow as an impeachment witness to show that John Smith had testified in order to receive leniency from the state.

(3) The trial court erred in admitting evidence suggesting that petitioner had killed Donny Henson because the evidence was offered to show petitioner's propensity to commit the charged crime.

(4) The trial court erred in admitting evidence of petitioner's height and weight, as derived from the booking sheet, because the evidence was irrelevant.

(Doc. 1 at 15-33; Doc. 16 at 15-33.)[1]

Respondent contends that all grounds are without merit. (Doc. 10.)

### III. STANDARD OF REVIEW

The Antiterrorism and Effective Death Penalty Act (AEDPA) requires that habeas relief may not be granted by a federal court on a claim that has been decided on the merits in state court unless that adjudication:

(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

(2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d)(1)-(2).

A state court's decision is "contrary to clearly" established law if it "arrives at a conclusion opposite to that reached by [the] Court on a question of law or ... decides a case differently than [the] Court has on a set of materially indistinguishable facts." Thaler v. Haynes, 130 S. Ct. 1171, 1174 (2010)(per curiam) (citation omitted). This standard is "difficult to meet" because habeas corpus "is a guard against

---

[1] In his amended petition, petitioner raised an additional two claims for relief. (Doc. 16 at 34-37.) Petitioner subsequently moved to voluntarily dismiss these two additional claims. (Doc. 21.) On June 4, 2010, the court sustained petitioner's motion to voluntarily dismiss these two additional claims. (Doc. 23.)

extreme malfunctions in the state criminal justice systems, not a substitute for ordinary error correction through appeal." Harrington v. Richter, 131 S. Ct. 770, 786 (2011) (citation omitted). A state court's decision involves an "unreasonable application" of clearly established federal law if "the state court identifies the correct governing legal principle from [the] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." Thaler, 130 S. Ct. at 1174.

A state court's factual findings are presumed to be correct. 28 U.S.C. § 2254(e)(1); Wood v. Allen, 130 S. Ct. 841, 845 (2010). Review under § 2254(d)(1) is limited to the record that was before the state court that adjudicated the claim on the merits. Cullen v. Pinholster, 131 S. Ct. 1388, 1398 (2011). Clear and convincing evidence that factual findings lack evidentiary support is required to grant habeas relief. 28 U.S.C. § 2254(e)(1); Wood, 130 S. Ct. at 845.

The standard for habeas review articulated by AEDPA applies only to those claims which were adjudicated on the merits by a state court. See Robinson v. Crist, 278 F.3d 862, 865 (8th Cir. 2002). Where a petitioner's claims were not adjudicated on the merits by a state court, the pre-AEDPA standard for habeas review governs. Cox v. Burger, 398 F.3d 1025, 1029-30 (8th Cir. 2005). Under the pre-AEDPA standard, the habeas petitioner must show a "reasonable probability that the error complained of affected the outcome of the trial or that the verdict likely would have been different absent the now-challenged [defect]." Robinson, 278 F.3d at 866 (citation omitted).

### IV.  DISCUSSION

#### Grounds 1-2: Ineffective Assistance of Counsel

Grounds 1 and 2 allege ineffective assistance of counsel. The right to constitutionally effective assistance of counsel is rooted in the Sixth and Fourteenth Amendments. Strickland v. Washington, 466 U.S. 668, 684-85 (1984). A person accused of a crime is entitled to be assisted in preparing and presenting his defense by an attorney who ensures the constitutional guarantee of a fair trial. Id. at 684-89.

To establish a claim of ineffective assistance of counsel, a habeas petitioner must demonstrate both that: (1) his counsel's performance was objectively unreasonable, and (2) he was prejudiced as a result of his counsel's deficient performance. Id. at 687-88. Courts reviewing counsel's performance must be "highly deferential in assessing whether counsel's course of conduct could be considered a sound trial strategy rather than an error." Marcrum v. Luebbers, 509 F.3d 489, 502 (8th Cir. 2007) (citation omitted). Counsel's conduct must be evaluated as of the time the decisions were made, not in hindsight. Rompilla v. Beard, 545 U.S. 374, 381 (2005). To show prejudice, the petitioner must show that the result of the proceedings would have been different but for the error. Strickland, 466 U.S. at 687.

**Ground 1: Right to a Speedy Trial**

Petitioner first claims his appellate counsel was constitutionally ineffective for failing to raise on direct appeal the denial of his motion to dismiss based on a violation of his right to a speedy trial. (Doc. 1 at 15-17.)

During the trial process, petitioner made several motions to dismiss based on lack of a speedy trial. (Doc. 11, Ex. C at 16-19.) Petitioner argues that his appellate counsel was ineffective for not raising this issue on appeal because the duration of the trial process, spanning from the date of remand, December 5, 1996, and through the beginning of his trial, February 22, 1999, was a violation of his right to a speedy trial.

In his motion for post conviction relief, petitioner raised this claim, which the trial court rejected and the Missouri Court of Appeals affirmed on appeal. (Doc. 11, Ex. H at 1; Doc. 11, Ex. K at 1, 14-16.) In its memorandum supplementing the opinion, the Missouri Court of Appeals determined that although nearly twenty-seven months passed from remand to the beginning of trial, petitioner failed to show the required prejudice resulting from the delay. (Doc. 11, Ex. K at 15-16.)

Petitioner cannot satisfy either prong of the Strickland test. As to the performance prong, appellate counsel is not required to bring every conceivable claim. Link v. Luebbers, 469 F.3d 1197, 1205 (8th Cir. 2006). "When appellate counsel competently asserts some claims on a

defendant's behalf, it is difficult to sustain a[n] ineffective assistance claim based on allegations that counsel was deficient for failing to assert some other claims." Id. "Generally, only when ignored issues are clearly stronger than those presented, will the presumption of effective assistance of counsel be overcome." Id. (citation omitted). Petitioner cannot overcome the presumption that his appellate counsel's decision not to raise the speedy trial issue on appeal was a reasonable trial strategy.

Nor can petitioner show the requisite prejudice from appellate counsel's failure to raise the speedy trial issue on direct appeal because petitioner's speedy trial claim would have lacked merit.

The Supreme Court has identified four factors for courts to weigh when evaluating a claim for violation of a right to a speedy trial: (1) the length of delay, (2) the reasons for the delay, (3) the defendant's assertion of the right to a speedy trial, and (4) prejudice to the defendant. Barker v. Wingo, 407 U.S. 514, 530 (1972).

The first Barker factor favors petitioner. The delay between when petitioner was charged and when the trial began was nearly twenty-seven months. (Doc. 11, Ex. K at 15.) As the Missouri Court of Appeals held, petitioner was presumptively prejudiced by this delay. See United States v. Jeanetta, 533 F.3d 651, 656 (8th Cir.), cert. denied, 129 S. Ct. 747 (2008) (stating that a delay approaching one year may require application of the Barker factors). Because petitioner was presumptively prejudiced, the analysis continues. Jeanetta, 533 F.3d at 651 (noting that if the defendant was not presumptively prejudiced, the court "need not examine the remaining three factors under Barker"); State v. Atchison, 258 S.W.3d 914, 919 (Mo. Ct. App. 2008) (noting that the presumptive prejudice of the first prong "is just a threshold below which a court need not even consider Barker's other factors").

The second Barker factor weighs slightly against petitioner because, on May 8, 1999, he sought a continuance that moved his trial from June 8, 1998 to February 22, 1999. (Doc. 11, Ex. C at 17-18.) While more than seventeen months of the delay were not caused by petitioner, petitioner nonetheless bore part of the responsibility for the overall delay. See Dickey v. Florida, 398 U.S. 30, 48 (1970) ("A defendant may

be disentitled to the speedy-trial safeguard in the case of a delay for which he has, or shares, responsibility.")

Similarly, the third Barker factor weighs slightly against petitioner because although he asserted his right to a speedy trial on several occasions, he requested a continuance that prolonged the process for several months. (Doc. 11, Ex. C at 18.) While Barker gives weight to claims brought by defendants who timely assert their speedy trial rights, that petitioner sought and received a continuance weighs against him. Barker, 407 U.S. at 531; United States v. Aldaco, 477 F.3d 1008, 1019 (8th Cir. 2007).

The fourth Barker factor is dispositive. Prejudice to the defendant can be established by a showing of actual prejudice or presumed in cases where the government caused excessive delay. United States v. Erenas-Luna, 560 F.3d 772, 778-79 (8th Cir. 2009). Whether actual prejudice resulted from the delay is "assessed in the light of the interests of defendants which the speedy trial right was designed to protect." Barker, 407 at U.S. at 532. The Barker Court identified three such interests: (1) preventing oppressive pretrial incarceration, (2) minimizing anxiety and concern of the accused, and (3) limiting the possibility that the defense will be impaired. Id.

As the Missouri Court of Appeals noted, petitioner offers no evidence of oppressive pretrial incarceration, anxiety or concern, or that his defense was impaired by the delay. (Doc. 11, Ex. K at 16); see Doggett v. United States, 505 U.S. 647, 655 (1992) (noting there was no actual prejudice where the defendant "failed to make any affirmative showing that the delay weakened his ability to raise specific defenses, elicit specific testimony, or produce specific items of evidence").

Nor can prejudice be presumed here solely from the length of delay. Petitioner's trial was delayed only by twenty-seven months, a portion of which was on account of his own motion for a continuance. See, e.g., Wilkins v. Bowersox, No. 11-3079-CV-S-DGK-P, 2011 WL 4833049, at *9 (W.D. Mo. Oct. 12, 2011) (noting no prejudice where delay was only twenty-seven months and was partly caused by the petitioner's motions for continuances). In light of the relevant circumstances, prejudice cannot be presumed to have resulted from the delay.

Thus, the sum of the Barker factors weighs against petitioner. Although the length of the delay was presumptively prejudicial, petitioner contributed to the delay by requesting a continuance and, ultimately, petitioner was not prejudiced by the delay. Because his speedy trial claim lacked merit, petitioner cannot establish prejudice from his appellate counsel's failure to raise his speedy trial claim.

Therefore, Ground 1 is without merit.

**Ground 2: Failure to Call Nancy McKerrow**

Petitioner argues his trial counsel was ineffective in failing to call Nancy McKerrow as an impeachment witness to show that John Smith had testified in order to receive leniency from the state. (Doc. 1 at 18-22.) Had counsel called McKerrow, she would have testified that John Smith believed the assistant attorney general would support his parole if he testified against petitioner and oppose his parole if he refused to testify. (Doc. 11, Ex. K at 11-12).

The Missouri Court of Appeals rejected petitioner's claim on the basis that McKerrow's testimony would have been cumulative because John Smith's testimony revealed that he expected to receive some benefit as a result of his testimony. (Id.)

The decision of whether to call a witness is normally part of trial strategy protected by the presumption of the first Strickland prong. Strickland, 466 U.S. at 687-88; Hanes v. Dormire, 240 F.3d 694, 698 (8th Cir. 2001) ("Decisions relating to witness selection are normally left to counsel's judgment, and this judgment will not be second-guessed by hindsight.") (citation omitted). To rebut this presumption, petitioner must show that it was objectively unreasonable for trial counsel to refrain from calling McKerrow. Strickland, 466 U.S. at 687-88.

Petitioner failed to rebut the presumption. Trial counsel testified at petitioner's post-conviction hearing that he decided not to call McKerrow because he did not think that calling McKerrow would benefit petitioner. (Doc. 11, Ex. J at 32.) Instead, counsel chose to impeach John Smith through cross-examination:

> Q. Was it told that if you cooperated with the State, that [the prosecutor] would do everything within his power to get you paroled?
>
> A. Yes, I've said that before. He didn't say, he said that he would come to my parole hearing.
>
> Q. And do everything within his power to get you paroled if you testified in this case?
>
> A. Speak in my behalf, yes.

(Doc. 11, Ex. D at 519.) Petitioner offers no reason as to why counsel's impeachment-by-cross-examination strategy was unreasonable at the time, and therefore fails the first Strickland prong.

Petitioner also fails the second Strickland prong because McKerrow's testimony would have been cumulative of John Smith's testimony. McKerrow's information was largely supplied by the cross-examination of Smith. See Bucklew v. Luebbers, 436 F.3d 1010, 1020 (8th Cir. 2006) (holding defendant not prejudiced by counsel's failure to call cumulative witnesses); State v. Bowman, 783 S.W.2d 506, 507 (Mo. Ct. App. 1990) (holding the exclusion of cumulative testimony did not result in unfairness to the defendant).

Moreover, further attack on John Smith's credibility would have offered little benefit, as John Smith's credibility had already been severely damaged by his own testimony. John Smith testified that after Mary Sadler and Donny Henson had been murdered, he and petitioner had to "get [their] stories straight;" that they attempted to implicate Terry Henson for the murders; and that he had lied to the police. (Doc. 11, Ex. D at 472-75.) After such testimony, McKerrow's testimony would have done little to damage Smith's credibility further. Thus, petitioner has not shown that the result of the trial would have been different had McKerrow testified. Strickland, 466 U.S. at 687.

In sum, petitioner has failed to show that trial counsel's decision not to call McKerrow to impeach John Smith was unreasonable trial strategy. Petitioner has also failed to show that his trial would have had a different result had McKerrow testified. Thus, petitioner has not satisfied either prong of the Strickland test.

Therefore, Ground 2 is without merit.

## Grounds 3-4: Error in Admission of Evidence

In Grounds 3 and 4, petitioner claims the trial court erred in admitting evidence. Whether the state court erroneously admitted evidence under state law is not a proper inquiry for a federal habeas court; a federal habeas court is limited to determining whether the state court's erroneous admission of evidence violated a petitioner's federal due process rights. Osborne v. Purkett, 411 F.3d 911, 917 (8th Cir. 2005). "A state court's erroneous evidentiary rulings can form the basis for habeas relief under the due process clause only when they were so conspicuously prejudicial or of such magnitude as to fatally infect the trial and deprive the defendant of due process." Id. (citation omitted).

**Ground 3: Admission of Prior Bad Acts**

Petitioner contends the trial court erred in admitting evidence suggesting that he killed Donny Henson because the evidence was for propensity purposes. (Doc. 1 at 23-28.) He argues that the evidence suggesting that he killed Donny Henson was irrelevant to the state's case against him for the murder of Mary Sadler and that the evidence was instead used to establish his bad character and propensity to commit murder. (Id.)

On direct appeal from petitioner's conviction, the Missouri Court of Appeals affirmed the trial court's decision to admit the evidence. (Doc. 11, Ex. E at 10.) The Missouri Court of Appeals explained:

> In the present case, [petitioner] objects to evidence suggesting that he murdered Donny Henson that the [s]tate presented in [petitioner]'s trial for the murder of Mary Sadler. These two events, the murder of Mary Sadler[] and the murder of Donny Henson, occurred within minutes of each other and at the same location. Evidence that [petitioner] killed Donny Henson was necessary to paint a coherent and intelligible picture of the events that transpired. The trial court did not err in admitting the evidence. . . .

(Id.)

Petitioner has not shown that the trial court erred or that the error deprived him of due process. The evidence admitted at trial suggesting petitioner killed Donny Henson was admissible because it was

intrinsic evidence used to provide context for the charged crime. Such evidence is admissible under Missouri and federal law. See United States v. Johnson, 463 F.3d 803, 808 (8th Cir. 2006) (recognizing that intrinsic evidence is admissible as an exception to Federal Rule of Evidence 404(b) because intrinsic evidence "'completes the story' or provides a 'total picture' of the charged crime") (citation omitted); State v. Harris, 870 S.W.2d 798, 810 (Mo. 1994) (en banc) (recognizing that evidence of uncharged crimes is admissible when the uncharged crimes "are part of the circumstances or the sequence of events surrounding the offense charged" because the evidence is necessary to present a "complete and coherent picture of the events that transpired").

Donny Henson's murder happened immediately following Mary Sadler's murder and only feet from where Mary Sadler was murdered. Given the location and timing of the murders, it was not unreasonable for either of the state courts to conclude that evidence regarding Donny Henson's murder was necessary to present a clear and coherent picture of the events surrounding Mary Sadler's murder.

Therefore, Ground 3 is without merit.

**Ground 4: Admission of Height and Weight**

Petitioner argues the trial court erred in admitting testimonial evidence of his height and weight, as derived from a booking sheet, because the evidence was irrelevant and unreliable. (Doc. 1 at 29-33.) The information on the booking sheet was gathered on August 25, 1997, and the murders occurred nearly six years prior on November 10, 1991. (Id.)

The Missouri Court of Appeals affirmed the trial court's decision to admit evidence of petitioner's height and weight derived from the booking sheet because it corroborated Bill Sadler's testimony and was therefore relevant. (Doc. 11, Ex. E at 13-14.) The court explained that the jury could determine the amount of weight to give the booking-sheet evidence in light of the passage of time between the murders and the creation of the booking sheet. (Id.)

The trial court did not err in permitting the testimony or admitting the booking sheet into evidence. There was no error because the testimony and booking sheet were reasonably necessary to corroborate

Bill Sadler's testimony. During the trial, Bill Sadler testified that he saw two men inside his house on the night of the murders. (Doc. 11, Ex. D at 339.) While he could not see their faces clearly, he could see that the larger of the two men was holding his wife's arm, and that the larger man appeared to be 5 feet, 10 inches tall and weighed 160 to 170 pounds. (Id. at 339-40.) The other, shorter man appeared to be only 5 feet, 6 inches tall. (Id. at 352.) John Smith testified that he was 5 feet, 9 inches tall and weighed 150 to 160 pounds at the time of the murder. (Id. at 430.) Terry Henson testified that he was 5 feet, 9 inches tall and weighed 125 to 130 pounds, and that Donny Henson was 5 feet, 6 or 7 inches tall at the time of the murder. (Id. at 886.) Thus, the booking-sheet testimony and evidence were probative of whether petitioner was the larger man inside the Sadler house.

Regarding the lapse in time between the murder and creation of the booking sheet, the jury was informed through cross-examination that the information from the booking sheet was gathered six years after the murder. (Id. at 650.) Thus, the jury was able to decide how much weight to afford the booking-sheet evidence, given the lapse in time. State v. Feger, 340 S.W.2d 716, 725-26 (Mo. 1960) (noting that "[o]rdinarily remoteness affects the weight rather than the admissibility of evidence unless it is so remote to be entirely without materiality").

In sum, admission of the booking-sheet evidence was not error because the evidence was probative of determining the identify of the larger man whom Bill Sadler saw holding his wife's arm and because the jury could determine how much weight to afford the evidence given its remoteness. Petitioner has not shown that admission of the booking-sheet evidence was so egregious that it violated his due process rights.

Therefore, Ground 4 is without merit.

## V. MOTION FOR APPOINTMENT OF COUNSEL

Petitioner moves for the appointment of counsel. (Docs. 33, 38.) Petitioner is proceeding pro se and in forma pauperis in this matter. Petitioner's entitlement to the appointment of counsel depends on several factors. These factors include the legal and factual complexity of the case, the ability of the indigent litigant to investigate the facts, the

existence of conflicting testimony, and the ability of the indigent to present his claim. Phillips v. Jasper County Jail, 437 F.3d 791, 794 (8th Cir. 2006); Morris v. Dormire, 217 F.3d 556, 558-59 (8th Cir. 2000).

After considering these factors and the record in this case, the court concludes that petitioner has clearly articulated his claims and stated the facts in support of those claims. The court believes that the facts and legal issues involved are not so complicated that the appointment of counsel is warranted.

Therefore, petitioner's motions for the appointment of counsel (Docs. 33, 38) are denied.

## VI. MOTION FOR AN EVIDENTIARY HEARING

Petitioner moves for an evidentiary hearing. (Doc. 34.) However, as discussed below, petitioner has not identified what facts need to be developed in an evidentiary hearing. Moreover, a federal habeas court may not consider evidence that was not properly before the state court. Cullen, 131 S. Ct. at 1398; see Price v. Thurmer, 637 F.3d 831, 837 (7th Cir. 2011).

Therefore, petitioner's motion for an evidentiary hearing (Doc. 34) is denied.

## VII. MOTION TO SUBSTITUTE PARTY

Petitioner moves to substitute Troy Steele, the new warden at Potosi Correction Center, where petitioner is currently incarcerated, as the respondent in this action. (Doc. 35.) As petitioner's custodian, Troy Steele is the proper named-respondent in this habeas action. 28 U.S.C. § 2242; Rumsfeld v. Padilla, 542 U.S. 426, 434 (2004).

Therefore, petitioner's motion to substitute Troy Steele as respondent in this action (Doc. 35) is sustained.

## VIII. MOTION FOR CONTEMPT

Petitioner moves for sanctions against respondent for failing produce certain transcripts. (Doc. 36.) Petitioner argues respondent's efforts in obtaining copies of the transcripts were deficient. On this basis, petitioner seeks evidentiary and monetary sanctions.

On March 9, 2011, the court ordered respondent to produce transcripts of proceedings in the Circuit Court of Reynolds County in petitioner's case on March 3, 1997, May 6, 1997, and September 25, 1997. (Doc. 26.) On June 22, 2011, respondent produced the transcript of the hearing held on September 25, 1997, but noted that this transcript was not presented to the state motion court or the Missouri Court of Appeals as part of petitioner's state court post-conviction proceedings. (Docs. 29, 29-1.) Respondent also submitted a letter from the current Reynolds County court reporter stating that the court reporter who would have transcribed the proceedings of March 3, 1997 and May 6, 1997 has passed away. (Doc. 29-2.) Thus, these transcripts appear to be unavailable.

Federal habeas review "is limited to the record that was before the state court that adjudicated the claim on the merits." Cullen, 131 S. Ct. at 1398. As noted by respondent, these transcripts appear not to have been presented to the state court during petitioner's post-conviction proceedings. Therefore, this court's consideration of the transcripts is precluded regardless of their unavailability.

In addition, sanctions are not appropriate in this matter because the record contains summaries of the proceedings. Rule 5(c) of the Rules Governing § 2254 Cases, which addresses the situation where a transcript is unavailable or otherwise cannot be obtained in a habeas proceeding, states that "[i]f a transcript cannot be obtained, the respondent may submit a narrative summary of the evidence." Rule 5(c), Rules Governing § 2254 Cases. Included in the record are docket sheets containing summaries of the proceedings for which petitioner sought transcripts. Thus, because the transcripts are unavailable to respondent, respondent is entitled to rely upon these narrative summaries.

Moreover, petitioner does not seek the transcripts for the purpose of ascertaining evidence not otherwise reflected in the record; petitioner contends the transcripts are necessary because they memorialize oral arguments by the parties and rulings by the trial court. (Doc. 24.) The state does not contest the trial court's grant of its motions for extensions of time on these dates, as reflected in the docket sheets contained in the record. (Doc. 10 at 10; Doc. 11, Ex. C at 13.)

As such, the remaining transcripts are not necessary for the full development of the factual record presented to the state court.

Therefore, petitioner's motion for contempt (Doc. 36) is denied.

### IX.  MOTION TO AMEND

Petitioner has also moved to amend his habeas petition to include claims for relief based on respondent's failure to produce transcripts from the hearings held on March 3, 1997 and May 6, 1997. (Doc. 37.) However, respondent's failure to produce transcripts in this case does not give rise to a colorable ground for habeas relief. Pruitt v. Hutto, 574 F.2d 956, 957 (8th Cir.), cert. denied, 439 U.S. 870 (1978) (holding habeas relief was not warranted based on due process violation where state trial transcript had been lost or destroyed but the record contained sufficient evidence to address the petitioner's claims because "the state is not required to perform the impossible"); see also Bransford v. Brown, 806 F.2d 83, 85-86 (6th Cir. 1986) (holding that the petitioner's due process right to a fair appeal was not violated by the absence of his jury instruction transcripts because he was not able to "present something more than gross speculation that the transcripts were requisite to a fair [appeal]"); United States v. Pate, 371 F.2d 405, 407 (7th Cir. 1967) ("We cannot agree that the mere fortuitous circumstance that a transcript was no longer available for use . . . entitled [the petitioner] to be set at liberty . . . ."). Moreover, respondent is permitted to rely upon the narrative summaries of the docket sheets in lieu of transcripts because the transcripts are unavailable. Rule 5(c), Rules Governing § 2254 Cases.

Therefore, petitioner's motion to amend (Doc. 37) is denied.

### X.  ORDER AND RECOMMENDATION

For the reasons stated above,

**IT IS HEREBY ORDERED** that the motions of petitioner Ronald R. Smith, Jr. for appointment of counsel (Docs. 33, 38) are denied.

**IT IS FURTHER ORDERED** that petitioner's motion for an evidentiary hearing (Doc. 34) is denied.

**IT IS FURTHER ORDERED** that petitioner's motion to substitute Troy Steele as respondent in this habeas action (Doc. 35) is sustained.

**IT IS FURTHER ORDERED** that petitioner's motion for leave to amend his petition for a writ of habeas corpus (Doc. 37) is denied.

**IT IS HEREBY RECOMMENDED** that the petition of Ronald R. Smith, Jr. for a writ of habeas corpus (Docs. 1, 16) be denied.

**IT IS FURTHER RECOMMENDED** that petitioner's motion for contempt (Doc. 36) be denied.

The parties are advised that they have 14 days to file written objections to this Report and Recommendation. The failure to file timely written objections may waive the right to appeal issues of fact.

/S/   David D. Noce
**UNITED STATES MAGISTRATE JUDGE**

Signed on December 12, 2011.